UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

**GLENDON SPARGO**                                                              **PLAINTIFF**

**v.**                    **No. 3:17-CV-00078-JTR**

**NANCY A. BERRYHILL,**
Deputy Commissioner for Operations,
performing the duties and functions
not reserved to the Commissioner
of Social Security Administration                             **DEFENDANT**

## <u>ORDER REMANDING TO THE COMMISSIONER</u>

Glendon Spargo ("Spargo") applied for social security disability insurance benefits with an alleged disability onset date of June 30, 2008. (R. at 190). The administrative law judge ("ALJ") denied his application after a hearing. (R. at 300). The Appeals Council denied Spargo's request for review. (R. at 1). The ALJ's decision now stands as the Commissioner's final decision, and Spargo has requested judicial review.[1]

For the reasons stated below, this Court reverses and remands the Commissioner's decision.

**I.    The Commissioner's Decision**

Spargo was insured under the Social Security Act through December 31, 2011. (R. at 23). The ALJ held that Spargo had the severe impairment of delusional

---

[1]The parties have consented in writing to the jurisdiction of the United States Magistrate Judge.

1

disorder through the date last insured. (R. at 23). According to the ALJ, Spargo had no physical limitations that would prevent him from performing a full range of work at all exertional levels, and Spargo's severe mental limitation (delusional disorder) could be accounted for by limiting him to unskilled work requiring the ability to understand, follow, and remember concrete instructions. The vocational expert testified that Spargo's residual functional capacity would preclude him from performing any of his past relevant work (R. at 28), but would allow him to perform other jobs in the national economy, such as work as a commercial cleaner and store laborer. (R. at 29). The ALJ therefore held that Spargo was not disabled. (R. at 30).

## II. Discussion

Spargo argues that the ALJ erred in finding that his delusional disorder was not so severe as to render him disabled prior to the date last insured. He maintains that the evidence of record supports the allegation that he has suffered from his mental impairments since prior to the date last insured. The Court agrees.

The main factor that prevented the ALJ from finding that Spargo was disabled prior to the date last insured was the lack of records showing mental health treatment from that time period. (R. at 27). Were Spargo's impairments of a different nature, the Court would be inclined to agree. However, the evidence in the record paints a clear picture of a claimant who has suffered from paranoid delusions for many years, and the ALJ ignored that evidence in arriving at his decision.

Spargo's testimony makes it clear he is seriously delusional and believes that the National Security Agency ("NSA") is monitoring him, taunting him, and possibly planning to kill him. (R. at 49–51, 61–63, 66–73, 76–80). His sister testified that these delusions have been a problem since at least 2006. (R. at 94).

Medical records from Randall D. Carlton, M.D., show that, in 2007, Spargo had the same delusions and wanted no help regarding his thoughts that the government was following him, because he firmly believed it was true. (R. at 353).[2] On October 4, 2010, Dr. Carlton noted that Spargo believed he was "on a list and marked for 'termination.'" (R. at 338). He diagnosed symptomology consistent with paranoid personality disorder or paranoid schizophrenia, and recommended that Spargo see a counselor. (R. at 338-39).

On October 28, 2010, Spargo underwent a diagnostic assessment at Mid-South Health Systems, by Christopher Dow, L.P.E. (R. at 315-19). During Spargo's mental status exam, Dow noted persecutory delusions, ideas of reference and an anxious mood. Dow stated that Spargo "believes he's watched at all times with high tech devices or spies planted around him in his daily life," and that "[t]his delusional

---

[2]At his first visit to Dr. Carlton, Spargo did not report any mental problems, but his sister informed the doctor that Spargo was a paranoid schizophrenic. (R. at 354). At a later visit, on August 15, 2007, Spargo initially denied feelings of being watched, but Dr. Carlton noted: "Sister gets him to open up about his belief that he is being followed & under surveillance by Homeland Security. Stems from incident in 80's when he had a walkie-talkie on LRAFB. Then was NSA now Homeland Security." Dr. Carlton opined that it "sounds like paranoid schizophrenia." (R. at 353).

3

belief system is well entrenched and causes anxiety and sleeplessness." He diagnosed Spargo as suffering from a delusional disorder.[3] (R. at 319).

To justify his decision that Spargo was not disabled prior to the date last insured, the ALJ focused on the lack of medical evidence related to Spargo's delusional disorder during that time period, and questioned why Spargo had not filed his disability claim sooner. (R. at 41–42, 78, 82, 85). In doing so, the ALJ characterized Spargo's October 2010 mental status examination as "essentially normal," except for an "anxious mood." (R. at 25, 27, 28). This cursory description omits the examiner's detailed discussion of Spargo's symptoms, the diagnosis of delusional disorder, and the express finding that Spargo's stress and anxiety were *due to his delusional thoughts.* (R. at 315, 317, 319).

In finding that Spargo was not disabled, the ALJ makes it clear he mistakenly believes a mental disorder can be evaluated in the same way as a physical limitation, and dismissed simply because of a lack of treatment. The Eighth Circuit has recognized that claimants suffering from severe mental impairments (especially delusional disorders) often reject the notion that they are mentally impaired, and fail to seek or comply with treatment, due to the nature of their mental impairments. *See Watkins v. Astrue*, 414 F. App'x 894, 896-97 (8th Cir. 2011) (remanding for

---

[3]This diagnosis was confirmed by David D. Erby, M.D., who approved a treatment plan for Spargo. (R. at 321).

reconsideration where ALJ relied primarily on plaintiff's noncompliance with treatment recommendations to discredit his allegedly disabling psychiatric symptoms due to bipolar disorder, paranoid thoughts, hallucinations and delusions); *Pate-Fires v. Astrue,* 564 F.3d 935, 945-47 (8th Cir. 2009) (remanding for consideration of whether plaintiff's noncompliance with treatment was excusable due to her schizoaffective or bipolar disorder; noting that "a mentally ill person's noncompliance with psychiatric medications can be, and usually is, 'the result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse'").

The record makes it clear that Spargo believes his delusional thoughts are true and that he does not have any mental health issues. (R. at 326).[4] He has stated that he wanted no help concerning his belief that he was being followed. (R. at 353). In fact, Spargo testified that the NSA is making him look delusional in order to discredit him. (R. at 49, 61). When questioned directly by the ALJ as to why he has not sought counseling, Spargo responded it was because the NSA was doing this to him. (R. at 76). As discussed, a counselor observed in 2010 that this belief system was "*well entrenched*" based on Spargo making it clear to the counselor that he "know[s] what [he] know[s] and it's really happening." (R. at 319). At a more recent 2014

---

[4]For example, in September 2014, Spargo told his doctor that a transmitter device had been implanted in his body when he was sedated with a BB gun, but "vehemently denie[d] having any mental/psychiatric disorder or disability." (R. at 326).

5

consultative examination, Spargo told the examiner that he was afraid of doctors because a doctor in the mid-eighties had sexually assaulted him while he was sedated. (R. at 363).

When considered in the context of Spargo's long-term severe delusional disorder, it is in no way surprising that he has not sought medical treatment for that problem. While this is almost certainly the explanation for the lack of medical evidence prior to the date last insured, the ALJ failed to even consider that possibility and reached the logically and medically unsustainable conclusion that Spargo's lack of medical records prior to his last insured date of December 31, 2011, must be taken to mean that Spargo was not suffering from a disabling delusional disorder at that time.

A December 18, 2014 consultative mental diagnostic evaluation by Catherine Adams, Ph.D., makes it clear that Spargo has a severe delusional disorder. (R. at 362–67). Dr. Adams diagnosed delusional disorder, persecutory type, and noted that Spargo was "completely out of touch with reality." She explained that his "interactions during interview were mostly socially awkward and inappropriate," his speech was "pressured while he provided copious examples of people he knew that were being followed by the government," and he was "extremely difficult to redirect and was extremely tangential." (R. at 365). She opined that he would have severe difficulty coping with work-type demands, moderate difficulty sustaining

persistence in completing work tasks, and moderate to severe difficulty completing tasks within an acceptable timeframe. (R. at 366).

In his decision, the ALJ *never mentions* Dr. Adams's consultative evaluation or opinion. While this evidence is from a time after the date last insured, the Eighth Circuit has held that later medical evidence can provide insight into a claimant's condition during the relevant period. *Pyland v. Apfel,* 149 F.3d 873, 877 (8th Cir. 1998); *Parsons v. Heckler*, 739 F.2d 1334, 1340 (8th Cir. 1984); *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984); *Poe v. Harris*, 644 F.2d 721, 733 n. 2 (8th Cir. 1981). The Eighth Circuit has also held that "properly corroborated retrospective medical diagnoses" can be used to establish whether an impairment began before a claimant's insured status expired. *Jones v. Chater,* 65 F.3d 102, 103-04 (8th Cir. 1995). Corroboration may come through testimony "from lay observers like family members." *Id.* at 104. Finally, if needed to fairly evaluate a claim, it is the ALJ's duty to develop the record "to establish with certainty the onset date" of an impairment, particularly where later evidence contains a definitive diagnosis. *Id.*

While Dr. Adams's December 2014 opinion indicates that Spargo's mental problems are long-standing, she did not make any findings – and apparently was not asked to make any retrospective findings -- regarding whether Spargo was suffering from a disabling mental impairment before his date last insured of December 31, 2011, nor does it appear that she was provided any of Spargo's medical records from

7

the earlier time period. Furthermore, although Dr. Adams's opinion documenting Spargo's severe delusional disorder was generated three years after his date last insured, it must be considered in context with the testimony of Spargo and his sister that Spargo has suffered from this same delusional disorder since at least 2006. The Court finds that their testimony, along with the medical records from 2007 and 2010, support the probative value of the consultative examination concerning Spargo's condition prior to the date last insured.

The ALJ rejected the testimony of Spargo's sister, Christy Owen ("Owen"), because her testimony merely repeated Spargo's "subjective complaints." (R. at 28). To the contrary, both Spargo and his sister described the identical delusional disorder that was documented by the December 2014 consultative examination, and they both credibly explained in detail that Spargo had suffered from this delusional disorder for many years. Thus, their testimony was *not* about "subjective complaints," but a diagnosed delusional disorder that Spargo had suffered from for many years prior to the 2014 consultative examination that *confirmed* the nature and extent of that severe mental problem.[5] During her testimony, Owen explained that her late mother did not

---

[5]The ALJ engaged in a lengthy examination of Spargo's sister about why Spargo had waited so long to file for benefits. The ALJ also asked her why Spargo had not applied for Title XVI benefits. Finally, the ALJ explained the difference between Title II (Disability Insurance Benefits, or DIB) and Title XVI (Supplemental Security Income, or SSI), and advised her that Spargo's 401k needed to be spent down so that he could qualify for Title XVI benefits. (R. at 82–94). The results of this over twelve-page examination are *irrelevant* to any of the important issues surrounding Spargo's claim for DIB and raise many questions about why the ALJ believed it was necessary to discuss with Spargo's sister an as yet *unasserted claim* for SSI benefits.

want Spargo to face the stigma of being disabled due to mental illness, and this led to the decision not to file for benefits sooner on the basis of his delusional disorder. (R. at 82–83). She also credibly explained that Spargo refused medication and that his family later tried to have him admitted to mental health facilities, which refused to take him because he was not dangerous to himself or others. (R. at 83–84, 87). She also testified to problems going back to 2006, when Spargo was working as a truck driver. (R. at 94). According to Owen, Spargo believed that the government was following him in red cars and he stated the intention of running red cars off the road, leading his family to encourage him to quit driving a truck and move back home. (R. at 93–94). Owen's testimony gives valuable insight into Spargo's delusional disorder, which he was unable to articulate because he believed his delusions were a reality.

Finally, the ALJ's statement that Owen's testimony is not supported by the objective medical evidence is plainly false. The objective evidence — especially the 2014 consultative examination -- corroborates Owen's testimony. This evidence, combined with the 2007 and 2010 records showing Spargo's delusions, creates a strong nexus between the alleged onset date and the consultative examination.

When viewed as a whole, the record clearly shows that Spargo has suffered for many years from these delusions. The last job he held was working at his parents' arcade. (R. at 52–53). As Spargo said himself, his parents were "able to overlook

9

[his] shortcomings." (R. at 52). Medical records from as far back as 2007 reveal that Spargo had the *same delusions* then as he does now. His sister's testimony further confirms this. Thus, substantial evidence does not support the ALJ's decision.

The Court concludes that this case must be remanded for a proper analysis of Spargo's severe mental impairments, which includes full and complete consideration of Spargo's medical records from 2007 through 2010 (with specific emphasis given to Spargo's October 28, 1010 diagnostic assessment from Mid-South Health Systems), and a full and complete evaluation and discussion of Dr. Adams's December 18, 2014 consultative mental diagnostic evaluation, which strongly supports Spargo's position that he is currently disabled and has been since before his last insured date. If necessary, the ALJ may further develop the medical record regarding Spargo's long-term and well-documented delusional disorder by having him re-examined by another consultative medical expert.[6]

### III. Conclusion

It is not the task of this Court to review the evidence and make an independent decision. Neither is it to reverse the decision of the ALJ because there is evidence in the record which contradicts his findings. The test is whether there is substantial

---

[6]*See Grebenick v. Chater,* 121 F.3d 1193, 1200-01 (8th Cir. 1997) (if the medical evidence regarding date of onset is ambiguous, and a retrospective inference is necessary, ALJ must call upon the services of a medical advisor to insure that the determination of onset is based upon a "legitimate medical basis"); SSR 83-20, 1983 WL 31249 (Jan. 1, 1983) (establishing onset date of disability).; 20 C.F.R. § 404.1519p (procedures for recontacting a consultative examiner when report does not serve as an adequate basis for decision-making).

10

evidence in the record as a whole which supports the decision of the ALJ. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). The Court has reviewed the entire record, including the briefs, the ALJ's decision, and the transcript of the hearing. The Court concludes that the record as a whole does not contain ample evidence that "a reasonable mind might accept as adequate to support [the] conclusion" of the ALJ in this case. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The ALJ's decision is therefore REVERSED and REMANDED to the Commissioner for further proceedings consistent with this Order.

It is so ordered this 3rd day of April, 2018.

_____
UNITED STATES MAGISTRATE JUDGE